BRAZEL v. EAU CLAIRE MILL–SUPPLY CO.

(Circuit Court, W. D. Wisconsin.   October 25, 1898.)

No. 294.

1. PATENTS—VALIDITY—IMPROVED SNOWPLOWS.
     The Brazel patents, Nos. 298,441 and 367,694, for improvements in snow-
     plows, are void for want of invention or patentable novelty, and were
     anticipated, more particularly by the Wyman Canadian patent, issued
     in 1873, and the Beer patent, No. 97,474, and, as a machine for cutting
     ruts, by an unpatented machine made and used in the pineries in Wis-
     consin in 1880.

2. SAME—MECHANICAL EQUIVALENTS.
     Adjustable wings attached to a snowplow, in the rear of the plows
     proper, for the purpose of carrying the snow loosened by the plows
     further away, are the equivalents of a rear set of plows used for the
     purpose of throwing the snow removed by the forward plows to a greater
     distance.

Suit in Equity for the Infringement of a Patent.

Watts S. Humphrey, for complainant.
Paul & Hawley, for defendant.

BUNN, District Judge.   This is an action brought to restrain the de-
fendant from infringing two letters patent for improvements in snow-
plows.   The first patent was issued May 13, 1884 (No. 298,441), and
the second on August 2, 1887 (No. 367,694).   Infringement is alleged
of the first claim of the 1884 patent, which is as follows:

"(1) The combination, with the plow frame or main frame and the sup-
porting runners, of the adjustable plows, G, the adjustable pivoted wings,
E, and hinged bars, F, substantially as and for the purpose set forth."

And of the second and third claims of the 1887 patent, which are as
follows:

"(2) In a snowplow, the combination, with a central supporting beam hav-
ing a bobsled secured at each end thereof and to suitable side beams, of
moldboards mounted in connection with the said side beams, extension
wings hinged in the rear of said moldboards, and a supplemental plow,
adapted to be raised and lowered, operating in conjunction with the central
and side beams ahead of the moldboards, substantially as described.

"(3) In a snowplow, the combination, with a central supporting beam hav-
ing a bobsled secured at each end thereof and to suitable side beams, said
beams having moldboards arranged on each side thereof and in connection
therewith, of an independently operating plow arranged in front of the said
moldboards, and adapted to be raised and lowered, substantially as de-
scribed."

By the specifications and drawings of the first patent, it appears
that the device consists of an ordinary bobsled having longitudinal
beams, supported upon the crossbars of the front and rear sleds.
Upon this frame are placed two moldboard plows with means for rais-
ing and lowering them.   Behind these plows, supported upon the
same frame, are diverging wings, one on each side, pivoted or hinged
at the front ends to the beam, and having their rear ends connected to
the hinged bars.   The plows are thus adjustable vertically in order

to regulate the depth to which they are to enter the snow. These plows throw the snow laterally to the sides of the sled, and the diverging wings carry it still further away. This is substantially all there is of the 1884 device. The 1887 patent shows the same machine mounted on bobsleds, but with the addition of two adjustable plows placed in front of the plows of the 1884 patent, either one or both of which supplemental plows may be used; the purpose of these additional plows being to cut the core of snow left in the center of the road by the plows of the 1884 patent, and throw the snow out laterally, so that it will be caught and thrown to either side by these other plows. These plows are adapted to being drawn by horses or oxen, for making or clearing out a road for sleighs or sleds. The function and purpose of the complainant's invention seems to be much like that of any snow-plow. It cuts a road the width of a logging sled, rolls and pushes the snow outside the track and away from the roadbed upon either side, and cuts off the knolls and hummocks of snow and ice ("cahots," as they are called in the Canadian patent in evidence), making the road comparatively level, and workable for sleds and teams. It is claimed by complainant's expert that the machine is a roadmaker as well as a roadbreaker, and may be used as a rutter to cut ruts for the sleigh runners, but the distinction does not seem to be important. So far as appears, complainant's machine works much the same as any other snowplow used for the purpose of breaking out a road which would be already passable except for the snow. It would not remove stumps or trees or bowlders or cradle knolls. Many and various patents have been introduced by the defendant, and other testimony given, to show the state of the art at the time plaintiff's patents were issued. The court has carefully gone through with these, and the conclusion which I have reached is that the patents in suit disclose no patentable invention or novelty over and above what is shown in prior patents.

It would be perhaps too much to say that none of these patents disclose what amounts to invention, or that, if the complainant was a pioneer in the art of making snowplows, his patent should not be sustained. He has, no doubt, a useful machine; and, if he were the first that had constructed a snowplow, very likely it should be held that his patents show inventive skill. At the same time, it is apparent that the radical idea and notion of all these plows is very old. They are all modeled upon the old forked tree crotch, hewn out and drawn through the snow of a road by a team of oxen, with a chain hitched to the pointed end of this rude, V-shaped instrument. This, and its immediate successor, the V-shaped frame, made of timbers and plank, with plank sides for moldboards, has been used in New England and New York since the landing of the Pilgrims. The changing these plank sides of the plow into steel or iron, and mounting them upon a frame of wood, to be drawn upon a sled, is a useful improvement, but seems more a matter of convenience, in getting something more effective and durable, than of inventive skill. And then to make these plows adjustable vertically or laterally, which was the next step in the improvement, and adding more plows to precede or follow, to make the work more perfect,—all these things would naturally sug-

gest themselves to a sensible person, whether a mechanic or not, who should have use for these plows.

But, allowing complainant's device, as shown by his different models in evidence, to show invention, provided it were all new in the art, so that the court could allow him a broad construction as to a pioneer, still it remains to be said that, instead of inventing any one thing in his combination of useful devices, they were each and all old and in use at the time his patents were issued. They were also used in the same way, each part performing the like function as in the complainant's patents. No new or useful force or result has been pointed out as coming from the complainant's combination of other people's devices. Without considering the various other patents in evidence, showing the state of the art, and that one or more of complainant's devices are shown in them, there is one (the Wyman Canadian patent, issued to Riley Wyman in May, 1873, 11 years before complainant took out his first patent) which I believe shows all the essential elements of complainant's device. The defendant's expert, Mr. See, correctly points out the things shown in this Wyman patent, a model of which is in evidence, as follows:

"First. A snowplow having front and rear bobsleds. Second. Two timbers connected to the bobsleds, and forming a frame. Third. Vertically adjustable plows attached to the timbers between the front and rear bobsleds. Fourth. Rear plows which are the equivalents of the hinged wings of the Brazel patents."

In reference to the operation of the Wyman machine, Mr. See says:

"It would seem to me that the snowplow of the patent in suit was utterly incapable of doing anything which the plow of the Wyman patent is not capable of, under the teachings of the Wyman patent, and that the capacities are not only there, but that Wyman's instrumentalities for reaching the capacities are the substantial equivalents of those set forth in the patent in suit."

The most important difference in the two patents seems to be that, instead of having the pivoted or hinged wings arranged in the rear of the plows, the Wyman patent provided a rear set of plows for the purpose of throwing the snow removed by the other plows further away, outside of the sleigh track. It seems quite apparent that these two devices are the equivalents, the one of the other. Wyman, in his patent, states that plows of any suitable shape may be used, according to the nature of the work to be performed, and that "in some cases a shovel plow will be best; in others, a plow having a horizontal chisel edge, and moldboard to throw cuttings to any desired side." These pivoted or hinged wings, also, were not new with complainant. They appear in the Beer patent, No. 97,474, substantially the same as in the Brazel patents. This appears clearly enough in the specifications, as follows:

"F, F, are large plates or wings, pivoted to the sides of the frame, D. The wings, F, are pivoted or hinged at their front ends, and can be swung on their pivots, so as to bring their rear ends more or less far apart. By adjusting the position of the wings, F, the width of the road to be cleared is regulated. The wings have inward-projecting perforated arms, e, which can, by suitable pins, f, be locked, to lock the wings in the desired positions."

I am unable to see anything material in complainant's patents that is not shown in the previous patents. There is one other difference in structure between the Wyman patent and the complainant's: Wyman arranges a pair of plows, with moldboards, side by side, to form his snowplow, and makes them adjustable laterally, so that, if they are placed some little distance apart, they will produce ruts or channels in the road upon each side of a central core of snow, in which the sleigh runners will pass. If set close together, no such core of snow will be left. So that you can make the road level, or leave a core in the middle, I suppose, according to your idea of putting water on the track, —whether it be desirable to sprinkle the track all over, or only in the ruts. Brazel constructs his in two ways: First, with the mold-boards together, as in his "first model of 1884 patent"; and, second, with the moldboards separated. Wyman puts a pair of plows side by side, with a mechanism to adjust them laterally, so as to have them close together, or more removed from each other. But the difference does not seem to be material. The Wyman patent, in this respect,— at least in theory,—would seem to be somewhat superior in excellence, on account of the adjustability of the plows laterally. I cannot see that there is much new about either, or that they show much, if any, invention. Moldboards, double and single, have been used in connection with road plows and scrapers for many years, in grading high-ways and railroads; and a double moldboard operates. in a snowplow, in turning the snow two ways, much as it would, and always has, in digging ditches in the ground. And, when you have one mounted on a bobsled, it is no great evidence of genius to add another having a similar operation. They are, no doubt, more lasting and effective than if made of wood; but the principle of operation is much the same, and the change of material is not necessarily invention. Of course, it might be in some cases, but I cannot think it is in this.

A serious inroad is made upon the complainant's claim of operating his plows as a rut cutter by the evidence showing that an adjustable rutter similar to that used by defendant has, in connection with snowplows, been used in the logging camps of Clark county from the fall of 1880. The evidence on this subject is quite clear and satis-factory, and. I think, comes fairly within the rule requiring certainty in oral evidence showing anticipation. It is sworn to by many ap-parently disinterested witnesses, and the time is fixed by entries in account books, and by other contemporary transactions, so that I can-not doubt the truth of the testimony. This device for a rut cutter was made by one Gilbert Johnson, a blacksmith at Hewittsville, who testifies very fully and circumstantially in regard to it, as do several other witnesses. It was made at the suggestion and under the di-rection of James Hewitt, a leading lumberman at Neillsville, to be used in his logging camps in Clark county, and was so used until it was worn out, and others made in its place. It is very succinctly described by Mr. Hewitt, in his testimony, as follows:

"Q. Could you describe that device,—tell how it was made,—in a general way? A. Well, it was a simple and cheap got up sled; the runners the same width as a logging sled, with a hole cut out in the bottom of the runners,

with a knife put in, the same shape as a knife in a jack plane, to cut the ice, fastened with a bolt to raise or lower it,—put in the center of the runner. Q. Where did you first see that rut cutter? A. I saw it when it was being built, and in fact it was my suggestion,—the building of it. They had the whole crew cutting ruts with axes; and I told my brother to get up something to do that with a team, and I gave him my idea, and he and Gilbert went at it and got it up."

Another witness, Louis Brillion, describes the device and its working, as follows:

"Q. Please look at this sketch made by Mr. Johnson, and state whether the first sketch, which is marked 'Rut Cutter,' properly shows the device as you used it the first winter on Wedge's creek. A. Just as near as I could make it myself. This is the runner, and this is the bolt that held the knife in position there. This slot cut in the knife where the figure 5 is, is to raise or lower it. It is probably two inches long. The slot makes an inch wide. The knife, when we first commenced making them, they were made of about half-inch iron; and we used to take a small piece of steel, and plate them with thin steel on the side, but late years we got heavy steel. This knife goes in here and fastens, a beam goes here and here, and that was about all there was to it. Q. Now, how did you use the device in making the road? A. Well, sir, we used it when the track got filled up with ice. We used to take this road gouger, and put on a pair of horses, or four horses,—we did not have as good horses then as we have now,—and let down this knife through the slot about an inch, and we run her the full length of the logging road down to the landing; and, if it did not cut enough to give satisfaction, if it was not deep enough, we also run it back again from where we started, cut it twice, which would make about an inch or two inches of a rut; and we run it once a week, and sometimes twice. If we had no snow weather, once a week was enough. If it snowed, we run our snowplow ahead of this, and took the snow out of the road, and bring the gouger after the plow, and the water tank after that; and when we got to the landing we would have a good road."

The evidence shows that at first the knife or plane was too narrow, and they made a wider one, which worked well and satisfactorily, and did the work which it had required many men to do. No invention was claimed for this device by Mr. Hewitt. He simply made it for his own use, to satisfy a want felt in his own camps. Probably it required no inventive skill to make it. The knife or chisel was adjustable vertically, like an ordinary wood plane. The defendant admittedly uses substantially this device in connection with an ordinary snowplow such as had been in use many years before the date of complainant's patent. Complainant alleges that by such use it is infringing his patent. I am of opinion, with defendant's expert, Mr. See, that it is not to be found in or inferred from the complainant's patent and specifications. But if it is, and the court has been unable to find it, I think, without doubt, the complainant was anticipated by about four years in his invention by the use of the Hewittsville rutter. The evidence shows, not only that defendant is using a rut cutter or jack plane attached to a sled to shave off the "cahots" in the sleigh tracks, but that the same device has been in use in the lumber camps of Wisconsin since the winter of 1880 and 1881; the first patent of complainant being issued in 1884. The complainant does not claim the specific construction of the rut cutter used by the defendant, but nevertheless alleges infringement in the use, on the ground that com-

plainant is a pioneer in the art, was the first to make an operative snowplow for the making and cleaning of roads, and is therefore entitled to a broad construction for his patent. It is evident that the complainant's patent cannot be stretched to cover the defendant's adjustable rutter, without making it cover also the Hewittsville adjustable rutter; and, if the defendant's rutter is an infringement of the complainant's device, the Hewittsville rutter must be an anticipation. Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81; Miller v. Manufacturing Co., 151 U. S. 186, 14 Sup. Ct. 310. I think the evidence shows that the complainant is not by any means a pioneer in the art of making snowplows, and should be limited to the specific construction shown in his patent. These the defendant does not use. There is more difference between the Brazel patent and the snowplow and rut cutter used by the defendant than there is between the Wyman and Brazel patents. And I can see nothing in the Brazel patent that does not appear in the previous patents, while in the Wyman patent is presented every essential principle of structure or operation seen in the complainant's device. The complainant's bill of complaint will be dismissed, with costs.