### DRIVER-HARRIS CO. v. HARDITE METALS, Inc.

District Court, S. D. New York.    October 4, 1928.

Bartlett & Brownell, of New York City (John P. Bartlett, Henry B. Brownell, and William P. Martin, all of New York City, of counsel), for plaintiff.

Fraser, Myers & Manley, of New York City (Arthur C. Fraser and Louis E. Giles, both of New York City, of counsel), for defendant.

HUTCHESON, District Judge. This is a suit brought on patent 1,270,519, granted to the plaintiff, Driver-Harris Company, assignee of John C. Henderson, dated June 25, 1918, for a "box for treating metallic articles by heat." The claims involved are claims 1, 2, and 3.

The Henderson invention comprises a box for heat-treating metallic articles, which, together with its cover, is made of an alloy essentially of nickel and chromium, or its equivalent, cobalt and chromium. The preferred alloy, as stated in the patent, and the alloy used by both the plaintiff and defendant, comprises nickel, chromium, and iron. The alloy actually used by plaintiff, as shown by stipulation, is essentially:

Chromium ...................12 to 15 per cent.
Nickel .....................60 to 65 per cent.
Iron .......................15 to 26 per cent.

By the same stipulation, the alloy used by defendant is admitted to be:

Chromium ...................12 to 15 per cent.
Nickel .....................65 to 70 per cent.
Iron .......................11 to 13 per cent.

This alloy of the defendant is squarely within claims 1, 2, and 3 of the patent in suit, and it is admitted by defendant's counsel that plaintiff and defendant are using the same kind of box; it follows, then, that if the patent is valid, and the box used by plaintiff is described in the patent, that infringement is also admitted.

That the patent, if valid, was infringed, is shown by the following colloquy:

"The Court: There is no question about the infringement, if it is a valid patent. You both used the same kind of box.

"Mr. Fraser: The same thing."

It is true that, in the brief filed after submission, counsel for defendant argued against infringement, declaring that, while the plaintiff and defendant are using the same kind of boxes, the boxes actually used by plaintiff are not those described in the patent in two particulars: (1) That the patent calls for a nonwarping box; and

(2) that it does not mention the presence of silicon; whereas defendant says both defendant's and plaintiff's boxes will warp and both contain silicon.

I do not think there is any substance in either of these points. Such silicon as is used to make the proper flux in molding or casting the box is negligible, and its presence cannot affect the patent claims; and while it is true that some boxes which had warped were introduced in evidence, and that perhaps all of them would warp in time, the boxes are, in substance and in their commercial use, nonwarping, as claimed in the patent. I conclude, therefore, that the patent, if valid, is infringed.

When the question of the patent's validity is considered, it is at once apparent that defendant is not only confronted with the ordinary technical burden of proof which the introduction of the patent casts upon him, but that that burden is made most substantial and most difficult to be borne by the fact that every collateral circumstance, and every objective test ordinarily considered in determining patentability, bears most strongly on the plaintiff's side. A brief consideration of the art in which these boxes function, and of the immediate response to and wide acceptance of them when introduced, will serve to establish this conclusion.

The boxes of the patent are used for carburizing steel articles, such as parts of ball or roller bearings, so as to introduce into the outer surface of the article sufficient carbon to enable it to be hardened by subsequent reheating and rapid cooling. The complete process of hardening the article comprises the carburizing as well as the reheating and cooling, and is known as "case hardening."

In case hardening, the steel articles hardened are first placed in carburizing boxes together with a carburizing compound, which is a material which, when heated, gives off carbon monoxide gas. The boxes, with their contents, are then introduced into a furnace and heated to about 1,700° F. and maintained at that heat for a considerable period, according to the depth of the "case" desired; in some instances four hours, and in other instances eight hours, or longer. They are then taken out of the boxes and allowed to cool, and are then reheated on trays or the like, and are, while hot, immersed in oil or water, so as to quench or quickly cool them. The surface thereupon becomes very hard and wear-resisting, while the center remains comparatively soft, and is both strong and durable.

This case-hardening process is very largely used in the manufacture of parts for automobiles, and is very important in that connection, as well as in connection with other devices where articles having hard wearing surfaces, and tough, but not brittle, cores are desired. Prior to the introduction of Henderson's box, the carburizing boxes in use for at least eight years were made of iron and steel. At the present time iron and steel boxes have been practically displaced by boxes of the Henderson type.

Driver-Harris began to put out Henderson boxes in 1915, finding an immediate demand for them; it has in all made and sold 4,480,000 pounds of boxes for a gross return of $4,700,000. The average life of iron and steel boxes is 350 to 500 hours; the guaranteed life of the Henderson box is 3,-000 to 5,000 hours, and some run as long as 15,000 hours. Defendant's witnesses admit that there is no other alloy that will accomplish the same result as the alloy used by both plaintiff and defendant in carburizing boxes.

Large manufacturers, such as the Timken Roller Bearing Company, have purchased as much as $700,000 worth of these boxes, and the testimony is overwhelming that they have tremendously affected carburizing operations, effecting great saving in cost and labor, and in fact made possible new and efficient types of carburizing furnaces, which were before unknown, and which would be impossible of realization, but for this improvement. That Henderson made a tremendous and valuable contribution to the heat-treating business cannot be questioned, for it can be easily deduced from the testimony of witnesses, and stands out inescapably from the actual commercial figures as to its use.

The defendant, then, in its efforts to overthrow the patent, is confronted with a difficult task, made none the less difficult by the fact that, himself a camp follower and an imitator of plaintiff, he has paid the highest tribute to the worth, if not to the patentable qualities, of plaintiff's device, by building upon it a business of large proportions, in the face of acquiescence in and recognition of the plaintiff's rights to the use of such boxes by the bulk of the users of them.

Recognizing this burden, defendant presents his position very well thus:

"After reading over the entire record and the briefs on both sides, it seems to me

that the decision of this case should be governed by the following facts and reasoning:

1. *Patentability.*—Did Henderson make an invention? Invention involves imagination; it must be something beyond a merely obvious step, such as may be taken, when a need arises, by any intelligent workman, or any skilled engineer, metallurgist, or other technician, by making use of knowledge already public as to the state of the art. It is only such a contribution which justifies the grant of a patent. A patent is a contract between the people and the patentee, and, where invention is nonexistent, the consideration fails.

"When the alleged invention involves only a change of material, the whole question is whether this change was obvious, in view of the existing knowledge as to the properties and advantages of that material, or was so unlooked-for a departure as to transcend what was known, and bring out unknown utilities of the material, or to disclose a surprising advantage, which existing knowledge could not have foreseen.

"Considering all the decisions cited in both briefs, the law as established by the weight of authority is that invention in a substitution of material is not established by the better utilization of known properties of the material, nor by mere acceptance or extended use; there must be some new property developed by the change, something beyond what could have been perceived by merely expert knowledge of the material. The new use must go beyond what was obvious.

"The known properties of nickel-chromium alloys were nonoxidation (or nonscaling) resistance to high temperature, strength while highly heated, and permanence or long life. These were precisely the desiderata for heat-treatment boxes; and to apply the alloy to that use was a simple short step, obvious to those familiar with its previous uses.

"The only possible *new property* developed by the substitution of this alloy in these boxes was the alleged fact of noncarburization. Its previous uses for other cast articles, even for salt-hardening pots, may not have subjected it to internal carburizing conditions. If it was noncarburizing when heated under such conditions, this fact may not have been known. Plaintiff's contention is that the new use of the material which for the first time made apparent this latent advantage supplied just that novel, surprising, or unforeseen result which would indicate that it went beyond a mere obvious substitution of known materials.

"All agree that, with the *boxes* of both plaintiff and defendant, carburizing is so nearly nonexistent as to be negligible."

And then arguing that the reason for this new and not before known property is, not the alloy described in plaintiff's patent, but the addition of silicon to the alloy, he concludes:

"This clearly explains why the boxes have this useful property of not carburizing. But the alloy with Si is not a part of the Henderson patent. It was not Henderson who showed how to make a noncarburizing alloy box. This was a subsequent improvement, made by some one else. Henderson's alloy—being the old Marsh wire alloy, without silicon—would have failed, because the boxes would have soon carburized, become brittle, and cracked."

This argument is a bold one, "daring to put it to the touch, to win or lose it all"; for, by admitting that the plaintiff's and defendant's boxes do exhibit the wholly new and unsuspected property of noncarburization, it enables the plaintiff to move out of his strongly entrenched position that, even if the use of the alloy in the carburizing box has brought to light no new property, the use of that alloy in a new field—that is, heat-treating boxes—in the light of its tremendous usefulness, is invention, and to grapple with defendant on the plain upon his bold contention that, though the boxes of plaintiff and defendant do exhibit this new property, they are not the boxes described in and covered by plaintiff's claims.

In this encounter I think plaintiff easily comes off the victor, upon the grounds, first, that the use of silicon was as a flux, and not for the purpose suggested by defendant; second, that, if silicon has any effect in increasing the noncarbonizing property, its effect in these boxes is so relatively small as to be insignificant; and, third, upon the proposition that, even if silicon has the effect claimed, it was plainly within the description and claims of the patent, because, on account of the high melting heat required for the alloy, as set out in the patent, and the difficulties of producing the necessary flux without the use of some silicon, which was a well-known and common practice, it was implied in the patent that whatever fluxing conditions were necessary to be created in casting the boxes would in fact be present.

Believing, as I do, that the invention here is not to be regarded as merely the use in a box of an alloy theretofore used in other devices, and exhibiting in the box only those properties exhibited in other uses,

416

but that the presence of this new property, noncarburization, makes the device highly patentable, it is not necessary for me to consider the further point, insisted on by plaintiff, that, irrespective of this new property, the first use of this alloy in heat-treating boxes, with the revolutionary results on the business, would be invention, even if the alloy in the boxes exhibited merely those properties commonly attributed to and observed in its use in other articles.

■ It remains only to consider whether plaintiff's patent is invalid because of the defense of double patenting. Upon this point of double patenting the authorities make it plain that the only inquiry for the court is: "Has the power to create a monopoly been invoked twice for the same thing?" If it has, there is double patenting.

In Miller v. Eagle Manufacturing Co., 151 U. S. 197, 14 S. Ct. 310, 38 L. Ed. 121, the court, after stating that it is the issue date, and not the filing date, which determines the priority of patents issued to the same inventor on the same machine, states the reason for the rule to be that the power to create a monopoly is exhausted by the first patent, and that a new and later patent for the same invention would operate to extend or prolong the monopoly beyond the period allowed by law, and the court concluded:

"The result of the foregoing and other authorities is that no patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ; that the second patent, although containing a broader claim, more generical in its character than the specific claims contained in the prior patent, is also void; but that, where the second patent covers matter described in the prior patent, essentially distinct and separable from the invention covered thereby and claims made thereunder, its validity may be sustained."

To the same effect is the opinion of Judge Sanborn, in Century Electric Co. v. Westinghouse Electric & Mfg. Co. (C. C. A.) 191 F. 352, in which in his clear and lucid way it is made to appear that "the sum of the whole matter is that, while an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former, it does not invalidate a later patent to him for a distinct, different, and separable invention whether generic or specific, * * * which is not actually claimed or secured by the earlier patent."

In the light of these decisions I think it perfectly clear that, while the first patent of Henderson, No. 1,190,652, undoubtedly included in its description the subject-matter of the second patent, that in suit, the claims of the second patent are for a device entirely separate, distinct, and different from any of the claims of the earlier patent. These, though, except in claim 6, expressed in terms so general as to be vague, being, if descriptive or inclusive of anything, certainly not of a closed container, or box such as the second patent claims. Defendant, in my opinion, finds himself on this defense in this dilemma, either the claims of the first patent are to be construed as having such breadth and vagueness of outline as to attempt to include within their terms an article so unrelated to them as defendant's second device, and therefore must be held to be void for uncertainty and inadequacy of description, or they must be held, if definite enough to be valid, to clearly exclude a closed container, such as plaintiff's second patent claims, and therefore no second patenting has occurred.

As to claim 6 of the first patent, certainly a clear description, and perhaps the only valid claim in it, it certainly cannot be contended that a cast iron valve as there described anticipates or covers the grant of monopoly to plaintiff's box, which operates in environments requiring and calling out an entirely different property, to wit, noncarburization, the existence of which in plaintiff's device has enabled plaintiff to actually not only monopolize a commercial market, but to revolutionize the industry to which it applies.

■■ I do not go with plaintiff in his criticism of the defense of double patenting, that it is technical and to be with great caution allowed. It is, when properly apprehended, of the utmost substantiality, and merely means, boiled down, that that which anticipates, if in a patent to another, equally anticipates, if in a patent to the same inventor. The only reason that the defense has obtained a specific position is that for the defense of anticipation prior disclosure, as well as prior patenting, may avail, whereas, in the case of the defense of double patenting, only the actual issuance of the first patent avails, for, contrary to the statement of Mr. Justice Brown, in Washburn v. Beat 'Em All Barbed-Wire Co., 143 U. S. 281, 12 S. Ct. 443, 36 L. Ed. 154, it is the issue date, and not the application date, which controls in double patenting. See Miller v. Eagle Mfg. Co., 151 U. S. 197, 14 S. Ct. 310, 38 L. Ed. 121, supra.

■ Since I think it perfectly clear that,

though the first Henderson patent disclosed the second Henderson invention, it did not claim it, the defense of double patenting must be disallowed.

Let plaintiff have its decree for injunction and accounting.