# SAUNDERS *v*. MILLER.

PATENTS; INTERFERENCE; FORFEITURE; ABANDONMENT; PRESUMPTIONS; REDUCTION TO PRACTICE.

1. While, in the case of a renewal application, the intention of the party in allowing his former application to be forfeited may, under sec. 4897, Rev. Stat. U. S. Comp. Stat. 1901, p. 3386, be inquired into for the purpose of determining the question of abandonment, such inquiry must be directed to the abandonment of the invention claimed in the original application, and not to some other invention that may be

described incidentally therein, and subsequently made the subject of a new application by the same party, and brought into interference. (Distinguishing *Mason* v. *Hepburn,* 13 App. D. C. 86; *Warner* v. *Smith,* 13 App. D. C. 111; *Cain* v. *Park,* 14 App. D. C. 42; *Christensen* v. *Noyes,* 15 App. D. C. 94; *Re Mower,* 15 App. D. C. 144; and *Cutler* v. *Leonard,* 31 App. D. C. 297.)

2. It is a reasonable presumption, especially when corroborated by other evidence, that a party skilled in the manufacture of a product to the making ·of which his invention relates, before he filed an application for a process, made experiments to ascertain whether the desired results could be obtained.

3. The failure of one of the parties to an interference, relating to an apparatus for manufacturing rubber shoes, to produce the original cast-iron mold, which did not form a part of the invention, upon which he made the first experiment with the invention of the issue, is immaterial, where he produces a steel mold which the evidence shows was an exact reproduction of the iron mold; and the evidence also shows that the latter was discarded because the steel mold produced a more finished product; and it is also immaterial whether he made tests by the use of a wooden last or an aluminum tree, where they form no part of the invention, and their use produced not a better article, from the standpoint of utility, but a smoother and better-finished product, as the applicant had a right to improve the method of using his device, as long as its practical utility was demonstrated before the adoption of the improved method.

4. Where, in an interference proceeding, any abandonment of the invention by one of the parties must, under the evidence, be based upon his acts before the other party came into the field, such abandonment will inure to the benefit of the public, and not to such other party.

5. An applicant for a process invention does not thereby abandon his right to thereafter claim a patent for the apparatus he discloses, especially where he states, in his application for the process, that such apparatus forms no part of the process. .

6. Caution in sufficiently testing the utility of an invention and establishing the value of a discovery before rushing into the Patent Office is to be commended rather than condemned.

7. Abandonment is never presumed, but, on the contrary, the presumption is against it; and the burden is on the one charging it to establish it by clear and convincing proof (following *Computing Scale Co.* v. *Automatic Scale Co.* 26 App. D. C. 238, 204 U. S. 609, 51 L. ed. 645, 27 Sup. Ct. Rep. 307); and where the law raises a presumption of abandonment, it may be rebutted by showing acts assertive of the in· ventor's right and of his intention, by experiment, to improve and perfect his discovery.

8. Where an inventor applies for and receives a patent which discloses another unpatented invention, not claimed, it is presumed not to be novel and is dedicated to the public by the patentee (following *Re Millett,* 18 App. D. C. 186) ; but this presumption is rebutted if the patentee has another application pending in the Patent Office, claiming it.

9. If the original inventor has, by his action, forfeited his right to a patent, the invention will be deemed to have been dedicated to the public, and no one subsequently claiming to be the inventor can acquire a property right in the invention.

10. Abandonment and dedication to the public use by one of the parties to an interference involving an apparatus for the manufacture of rubber shoes is not shown, where it appears that he made experimental tests of the product of his invention by having boots made with it worn by the men in the employ of the company with which he was connected, testing them in connection with boots then being manufactured, continued his experiments for two years, and filed an application for the process, followed by an application for the apparatus.

No. 574.   Patent appeals.   Submitted May 17, 1909.   Decided June 1, 1909.

HEARING on an appeal from the decision of the Commissioner of Patents in an interference case.                    *Reversed.*

The facts are stated in the opinion.

*Mr. Harold S. MacKaye* and *Mr. William H. Kenyon* for the appellant.

*Mr. William S. Hodges* and *Mr. William R. Tillinghast* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This case comes here on appeal by Emmett A. Saunders from a decision of the Commissioner of Patents in an interference proceeding involving an apparatus for the manufacture of rubber boots and shoes.   Each of the three tribunals of the Patent Office awarded priority of invention to appellee, Thomas

Miller. The issue is set forth in five counts, of which the following are sufficient for the purpose of this case:

"1. In a device of the character described, a mold adapted to form the heel, sole, and foxing portions of a shoe from rubber or other plastic material, means for applying heat to said mold for vulcanizing its contents, means for applying pressure to said mold while vulcanizing, and means for causing resistance to the plastic material so the same will be forced into the pores of the upper.

"3. In a device of the character described, a mold adapted to form the heel, sole, and foxing portion of a shoe, a last over which a shoe may be formed, the same being adapted to fit the mold and assist in the formation of the heel, sole, and foxing therein, means for applying heat and pressure to the material, and means in said last and mold for causing resistance to the plastic material so that the same will be formed into pores of the upper.

"5. In a device of the character described, a mold adapted to form the heel, sole, and foxing portion of a shoe from rubber or other plastic material, means for applying heat to said mold for vulcanizing its contents, a last or form to assist in the formation of the heel, sole, and foxing portion, means for applying pressure to said mold while vulcanizing, and means engaging the foxing-line to better retain the material while under pressure."

It will be observed that the invention in issue relates to apparatus for the manufacture of rubber footwear. It is described by the Examiner of Interferences as follows: "It is an improvement the novelty of which principally lies in the manner of forming certain portions of the last and the mold in such a way that when they are forced together the plastic material inclosed between the last and the mold is pressed along the foxing line, thereby enabling the foxing to be securely fastened to the upper part of the shoe when the whole is vulcanized."

It appears that, on February 24, 1905, appellant filed in the Patent Office an application for a patent entitled "Improvement in Rubber Footwear, and Process of Making Same."

This application described the apparatus involved in this inter-ference, but only claimed the right to a patent for the process of making rubber footwear by use of the apparatus. In appel-lant's application, it was stated that "the apparatus whereby my process is carried out forms no part of this invention, as any form of machine appropriate to accomplish all the steps above described may be employed." In compliance with the requirements of the Patent Office, appellant's original appli-cation was divided, on June 17, 1905, by the filing of a divison-al application claiming the article of manufacture—in other words, the product—claimed in his original application. The drawing in the divisional application and the description of the apparatus employed were exact copies of the original appli-cation, and, it may be stated, fully described the invention here in issue.

Two days after the filing of the divisional application, on June 19, 1905, appellee filed his application for a patent for the invention here in issue, describing a device very similar to that described in both appellant's original and divisional appli-cations. Appellee claims a conception and disclosure of his in-vention in 1902, but no reduction to practice is claimed prior to his filing date. We have examined the evidence carefully on this point, and think he has established no time to which he can relate beyond the filing date. The tribunals of the Patent Office, without passing definitely upon the evidence, accorded him this date, which is all that we feel the record will justify.

There were, therefore, in June, 1905, three applications pending in the Patent Office showing the invention in issue, two of which belonged to appellant, who did not claim the in-vention as apparatus, the third belonging to appellee, who did claim the invention as apparatus. Inasmuch as appellee claimed the invention as apparatus, and appellant claimed it as process and product, under the rulings of the Patent Office, no opportunity was afforded for placing appellant in interfer-ence with appellee, or of otherwise notifying appellant of ap-pellee's claim to the invention. *Myers* v. *Brown,* 112 Off. Gaz. 2093.

Appellee was granted a patent without interference on April 17, 1906. In the meantime, appellant's original application had been allowed with claims for process, and the last day allowed for the payment of the final fee was April 16, 1906. The fee was not paid, and, in consequence, appellant's original application became forfeited on April 17, 1906, the same day on which appellee's patent was issued. On September 8, 1906, appellant renewed his original application, which was subsequently allowed by the Patent Office. After the renewal of the original application, appellant, learning of appellee's patent, filed a new application January 10, 1907, in which he copied exactly the drawing and description in his original application of February 24, 1905, and in which the claims of appellee's patent, being claims for the same invention as apparatus, were copied for the purpose of interference. On request of appellant, the present interference was declared. It will, therefore, be observed that, while the original application of appellant describing fully the apparatus which is the subject of the invention here in issue was forfeited, the renewal application was filed within the statutory period of two years. It should also be remembered that appellant's divisional application, which antedates appellee's filing data, was pending in the Patent Office at the time of the issuance of the patent to appellee and the declaration of this interference.

A fair analysis of the evidence discloses that appellant, in 1904, was manager of the rubber manufacturing department of the Mishawaka Woolen Manufacturing Company. In July of that year, he made sketches of the device in issue, and showed them to one Warner, assistant manager of the rubber department of the same works, with instructions to have made a mold embodying the idea shown in the sketch, and to demonstrate whether it was practical for the manufacture of boots and shoes. Warner testified that he took the matter up with their head machinist, and they decided to make a cast-iron mold. Testifying on this point, he said: "We got a fairly successful sole from this mold; in fact, we made several, attached them to the boot in the manner described previously, put them on our

own men in the wash room to determine by experiment whether there was real value in the invention. These soles, made from a lower grade of stock than the ordinary sole, gave about twice the amount of wear that the regular sole did. This encouraged us to proceed with a better mold, which we could finish to truer lines and with better surface, from which second mold we made several soles, attached to the boots." The witness was then asked:

*Q.* Is the actual iron mold marked "A," which forms part of this exhibit, one of the molds which you used in 1904, and, if so, which? *A.* The mold in the exhibit is substantially a duplicate of the first mold we made, with the exception of substituting some steel portion instead of cast iron; I cannot identify the exact date of this present mold.

*Q.* What has become of the first cast-iron mold, so far as you know? *A.* Am unable to locate the first mold; as it was of cast-iron, it was hard to finish to a smooth surface; we therefore laid it aside, and substituted the present steel mold, and are unable to locate the first cast-iron mold.

*Q.* Is this mold marked "A," and forming part of this exhibit, a mold which has been used for making rubber boots and shoes? *A.* It is.

*Q.* At how early a date, so far as you remember, was that first cast-iron mold used in actually making a boot or shoe? *A.* To the best of my remembrance, it was prior to October 1, 1904.

*Q.* Do you remember giving a rubber boot made by the apparatus and process you have described, to Mr. E. A. Saunders, to be taken to his patent attorney? *A.* I do.

*Q.* What mold was used in making that boot? *A.* Am not positive whether the first cast-iron mold or the present steel mold was used.

\*        \*        \*        \*        \*        \*        \*        \*

*Q.* Please state the extent to which the type of apparatus you have described has been used, substantially in the manner you have described, under your supervision since 1904. *A.*

Have made several of these boots and put them on our own men in the mill. One of the boots with molded sole with one of ordinary manufacture, to determine by experiment their value. These boots were made at intervals of two or three weeks, as we wished to determine the value of the different compounds from which we made the sole.

A witness, Smitly, a machinist in the Mishawaka works, identified the device in evidence as the one made under his supervision in August, 1904. He also testified to having previously made a cast-iron mold; that the molds were made by order of Warner, and that, when completed, they were delivered to the foreman in the heel press room. Appellant's attorney testified that appellant disclosed the invention in issue to him in his office in New York city in December, 1904, or January, 1905, showing him at this time a section of a boot which is an exhibit in this case, stating that it was part of one of the boots made on the first cast-iron mold and delivered to him by Mr. Warner when the experiment of 1904 was made. On this disclosure the attorney prepared the process application, which was filed in the Patent Office, February 24, 1905.

We think it is clearly established by the record that in the summer or fall of 1904, appellant constructed a cast-iron device similar to the steel one exhibited in this case, and used it in making a number of rubber boots. These boots were not made in pairs, but single, for wear on the right foot. The object of appellant in so making them was to test their wearing qualities in competition with the boots then being manufactured. Appellant's agent took the boots thus made and matched them with boots of the quality in general use, and gave a pair to each of a number of men in the employ of the company with which appellant was connected, to be worn by them in the wash room of the factory. It appears that, under this test, the boot made by this process wore as long as two made by the process then in general use. After making the first boots on the cast-iron device in the summer of 1904, the steel device in evidence was made in the fall of the same year. It also appears that two

other cast-iron molds of the same general pattern were subsequently made. The cast-iron molds were discarded for the reason that the steel mold was smoother and produced a better-finished product. Subsequently, boots were made at different times, and put to the same test as those made for the first experiment.

The tribunals of the Patent Office place great stress upon the effect of appellant's allowing his original application for the process to become forfeited, and the granting of a patent to appellee before the renewal application had been filed. In our view, it has little bearing upon this controversy, either as establishing abandonment, or as evidencing intention of abandonment. When appellant's original application was forfeited for nonpayment of the final fee, he had two years within which to renew it. This is permitted by sec. 4897, of the U. S. Revised Statutes, U. S. Comp. Stat. 1901, p. 3386, which reads as follows:

"Sec. 4897. Any person who has an interest in an invention or discovery, whether as inventor, discoverer, or assignee, for which a patent was ordered to issue upon the payment of the final fee, but who fails to make payment thereof within six months from the time at which it was passed and allowed, and notice thereof was sent to the applicant or his agent, shall have a right to make an application for a patent for such invention, or discovery the same as in the case of an original application. But such second application must be made within two years after the allowance of the original application. But no person shall be held responsible in damages for the manufacture or use of any article or thing for which a patent was ordered to issue under such renewed application prior to the issue of the patent. And, upon the hearing of renewed applications preferred under this section, abandonment shall be considered as a question of fact."

It will be observed that, in the case of a renewal application, the intention of the party in allowing his former application to become forfeited may be inquired into for the purpose of determining the question of abandonment. Such inquiry must be

directed, however, to the abandonment of the invention claimed in the original application, and not to some other invention that may be described incidentally therein and subsequently brought into interference. This eliminates any consideration of the cases of *Cutler* v. *Leonard,* 31 App. D. C. 297; *Cain* v. *Park,* 14 App. D. C. 42; *Mason* v. *Hepburn,* 13 App. D. C. 86; *Warner* v. *Smith,* 13 App. D. C. 111; *Christensen* v. *Noyes,* 15 App. D. C. 94; and *Re Mower,* 15 App. D. C. 144,—relied upon and cited in the opinion of the Commissioner of Patents. In all of these cases, the application of the above statute was involved. In all of them, the invention on which a patent was sought was the same in both the original and renewal applications. In the present case, however, the statute cannot be invoked. The apparatus, the subject of the present interference, was not claimed in the original application. Neither was it claimed in the renewal application; hence, those applications are not involved in this controversy, except in so far as the description therein contained of the invention here in issue may be relied upon as tending to prove conception and disclosure by appellant. The filing of the process application cannot be considered as constituting a constructive reduction to practice of the apparatus, for it was not the invention involved in the application. We have presented, therefore, the following case:, Appellee filed an application for a patent on June 19, 1905, upon which a patent was granted April 17, 1906. Appellant filed an application for a patent for the same invention on January 10, 1907, and asked to be put in interference with appellee, which request was properly granted. The case is narrowed to the usual questions in an interference proceeding,—priority of conception, disclosure, and reduction to practice, with the attendant charge of abandonment.

We think the evidence discloses a reduction to practice of the device by appellant as early as the summer or fall of 1904. Not only is this established by the testimony of appellant and the witness Warner, but it is corroborated by the circumstances of the case. We find appellant in the Patent Office as early as

February, 1905, seeking a patent for the process which described the apparatus here in issue. The process is not a complicated one, neither is the apparatus complex in its mechanism. It is reasonable to assume that the application for the process was based upon an actual experiment, and that experiment must have been made by use of the apparatus therein described and the one here in issue. It is hardly possible that appellant, a man shown to be skilled in the manufacture of rubber footwear, with every facility at hand for making tests, would make an application for a process for making goods without having made any experiments to ascertain whether the desired results could be obtained. While it may be conceded that the burden of proof is too great on the appellant to be removed by mere presumptions, yet reasonable presumptions may be indulged when directly inferable from positive evidence. In view of the evidence, as disclosed by the record, and corroborated by the process application, we think the conclusion is irresistible that appellant was not only in possession of the device involved in this interference in 1904, but that he put it into actual use and reduced it to practice in that year.

The Commissioner of Patents dwells at some length upon the failure of appellant to produce the original mold. True, the first mold made of cast-iron, on which the first experiment is shown to have been made, is not before us, but the mold here exhibited is shown by the testimony of corroborating witnesses to have been made in 1904. We think this, however, is quite immaterial. If all the experiments for the period between the first test in 1904 and the filing of the application for patent in January, 1907, had been made in one or more cast-iron molds which had been discarded, and the steel mold here exhibited had been made and proven to be an exact reproduction of the cast-iron molds, it would be as valuable for the purpose of securing a patent as if it had been made and was in existence when the first test was made. The device is a simple one, not only easily reproduced, but its similarity to another device for the same purpose is readily susceptible of proof. It appears conclusively from the evidence of the witness Warner, offered in

corroboration of appellant, that boots were made for experimental purposes at various periods after the experiment of October, 1904. In November, 1906, an experiment was made with an aluminum tree to overcome defects arising from the use of wooden lasts. This experiment was so successful that a full set of aluminum trees was ordered. This occurred after the granting of the patent to appellee, and about two months before the application of appellant was filed. While it might be charged that appellant was spurred to the aluminum test by the knowledge of appellee's patent, we think this is not important, in view of the successful tests made with wooden lasts extending back to 1904. It is immaterial for the purposes of this inquiry whether the reduction to practice was made by the use of a wooden last or an aluminum tree, since they form no part of the invention. Appellant could improve the method of using his device so long as its practical utility had been demonstrated before the adoption of the improved method. The use of the aluminum tree does not seem to have been adopted as a final experiment to make the device operative, but because this quality of tree would better withstand the vulcanizing process, and produce not a better article, from the standpoint of utility, but a smoother and better-finished product. Hence, the adoption of the aluminum tree may be considered merely as a continuation of the experimental tests. The question, therefore, presented, is whether a period of between two and three years of experimental tests by making the article and having it used by men in appellant's employ, without any other act tending to convert the product into public, commercial use, before applying for a patent, is sufficient upon which to base a finding of abandonment?

There was a complete disclosure and reduction to practice of the invention in 1904. Conceding for the moment that the statement in the process application could be held to constitute abandonment, it would be an abandonment to the public, and not to appellee, since it occurred before appellee came into the field. The record discloses undeniably that appellant, and not appellee, is the real inventor of the device in issue. The disclosure and

reduction to practice was followed by experiments as to its utility through the succeeding two years. The finding of the Patent Office that appellant's apparatus of 1904 was nothing more than an abandoned experiment is not supported by the record, and, with this suggestion as to our view on this point, it will be dismissed without further consideration.

This invention, therefore, belongs either to appellant or to the public. As before intimated, if abandonment can be established, it must be predicated upon acts of appellant committed before appellee came into the field. In that event, in the state of this record, it would inure to the benefit of the public, and not to appellee. Appellant was making experimental tests of the product of his invention, though in a somewhat public manner, by having the boots worn by men in the employ of the company with which he was connected; but this is not sufficient to constitute a dedication to public use. Some manifest intention must be shown on the part of appellant to abandon his invention. It is not necessary that the intention of an inventor should be expressed in words. It may be inferred from his acts. In *Kendall* v. *Winsor,* 21 How. 322, 16 L. ed. 165, the court said: "It is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public, and this he may do either by express declaration or by conduct equally significant with language,—such, for instance, as an acquiescence, with full knowledge, in the use of his invention by others; or he may forfeit his rights as an inventor by a wilful or negligent postponement of his claims." Applying this rule to the case at bar, we find nothing in the record to justify us in bringing appellant within its limitations.

It will be observed that appellant, in his original process application, does not disclaim any right to an invention for the device in which the process was conducted. He very truly says it forms no part of the process invention; but that is far from either a disclaimer or an abandonment of his right to claim a patent for it, should the experiments prove that a valuable device for manufacturing rubber footwear had been discovered. The invention seems to be a valuable one. Caution in suf-

ficiently testing the utility of an invention, and establishing the value of a discovery before rushing into the Patent Office is to be commended, rather than condemned. Merely permitting others to use the product of an invention before applying for a patent does not amount to abandonment. No effort was made to sell the invention or its product. Abandonment is never presumed. On the other hand, the presumption is against abandonment, and the burden is on the one charging it to establish it by clear and convincing proof. *Computing Scale Co.* v. *Automatic Scale Co.* 26 App. D. C. 238, affirmed in 204 U. S. 609, 51 L. ed. 645, 27 Sup. Ct. Rep. 307. It is likewise the law that where the evidence raises a presumption of abandonment, it may be rebutted by showing acts assertive of the inventor's right and his intention, by experiment or improvement, to perfect his discovery. It is generally held that where an inventor applies for and receives a patent which discloses another unpatented invention, not claimed, that it is presumed not to be novel, or is dedicated to the public by the patentee. *Re Millett,* 18 App. D. C. 186. This presumption is rebutted if the patentee has another application pending in the Patent Office, claiming it (*Miller.* v. *Eagle Mfg. Co.* 151 U. S. 186, 38 L. ed. 121, 14 Sup. Ct. Rep. 310), or if he files such application promptly (*Dederick* v. *Fox,* 56 Fed. 714). We think appellant comes within the latter class.

Prior knowledge and use in this country negative novelty, and constitute an anticipation of the thing patented. Where a patent is thus anticipated, no right to a monopoly in it can be acquired by the patentee. It either belongs to the original inventor or the public. If the original inventor has, by his action, forfeited his right to a patent, the invention will be deemed to have been dedicated to the public, and no one subsequently claiming to be the inventor can acquire a property right in the invention. The rule is well stated by Walker in his work on Patents, secs. 71 and 72, as follows: "Novelty is negatived by prior knowledge and use in this country, by even a single person, of the thing patented. This rule applies even to cases where that knowledge and use were purposely kept secret; and it applies no matter

how limited that use may have been.   *   *   *   Novelty is also negatived by evidence that even one specimen of the thing patented was made in this country, prior to its invention by the patentee, even though it was not used prior to that time. This rule results from the statute which provides that things, in order to be patentable, must not have been known or used by others in this country.   *   *   *   If, however, the identity of the patented and the prior article can be known only by actual use, and if the prior article never was actually used till after the date of the patented invention, then its prior making will not negative novelty. In that case, though its existence was known prior to the invention of the patented thing, it was not known to be what the patented thing afterward was. Knowledge, in order to negative novelty, must include knowledge of the character, as well as knowledge of the existence, of the prior thing."

Applying this rule to the case at bar, it will be observed that the construction and use by appellant of the device in issue, long prior to the earliest date that can be awarded appellee, negatived its novelty, and made it a complete anticipation of the invention claimed by appellee.

We find appellant, almost to the date of filing his application, improving the device and testing the product, and with reasonable promptness, after its utility had been demonstrated, filing his application for a patent. The law as to the right of an inventor to conduct experiments, and what constitutes a dedication to public use, is well expressed in the case of *Elizabeth* v. *American Nicholson Pav. Co.* 97 U. S. 126, 24 L. ed. 1,000, where Mr. Justice Bradley, speaking for the court, said: "When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be neces-

sary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a bona fide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute."

This, we think, aptly applies to the case before us. The product of this invention was such as to require time to test its durability. Appellant lost no time in manufacturing a number of boots, putting them into wearing competition with boots then being manufactured. He had the men in the wash room of the factory wear one of each at the same time, thus subjecting them to the best possible test. Such a trial would take considerable time. We think the time consumed in testing the product was not unreasonable. No necessity arose for making an application for a patent for the machine until the experiments had proved a success. We find nothing in the record justifying a charge of abandonment.

The decision of the Commissioner of Patents is reversed, and the clerk is directed to certify these proceedings, as required by law.                                                     *Reversed.*