**BALLARD & BALLARD CO. et al. v. BORDEN CO. et al.**

Civ. A. 1996.

United States District Court
W. D. Kentucky, Louisville.

Aug. 14, 1952.

Curtis, Morris & Safford, William C. Conner, New York City, Hubert T. Willis, Middleton-Seelbach, Wolford, Willis & Cochran, Louisville, Ky., for plaintiff Ballard.

Henry E. McElwain, Jr., Allen, McElwain, Dinning & Clarke, Louisville, Ky., Victor P. Kayser, Snyder, Chadwell & Fagerburg, Chicago, Ill., for intervenor plaintiff Kraft Foods, Inc.

Maxwell Barus, W. P. Churchill, Fish, Richardson & Neave, New York City, John Marshall, Jr., Peter, Heyburn & Marshall, Louisville, Ky., for Borden Co.

Philip Subkow, Los Angeles, Cal., Allen E. Susman, Loeb & Loeb, Los Angeles, Cal., William Marshall Bullitt, Bullitt, Dawson & Tarrant, Louisville, Ky., for Ready-To-Bake Foods, Inc.

SHELBOURNE, Chief Judge.

The original complaint in this action was filed March 29, 1950, by Ballard & Ballard Company against the Borden Company, charging infringement by the latter of a process patent, number 2,478,618 granted to Lowell Armstrong and Lively B. Willoughby August 9, 1949, and which patent was owned by Ballard & Ballard Company by recorded assignment from the inventors.

The complaint contained a second cause of action, charging unfair practices by Borden in the simulation of plaintiff's packages and labels, which Borden used on packages bought for sale from Ready-To-Bake Foods, Inc.

October 20, 1950, Ready-To-Bake Foods, Inc., having obtained an order permitting it to intervene as a party defendant filed its answer and counter-claim. It denied infringement, attacked the validity of plaintiff's patent and, in its counter-claim, sought a declaration of rights absolving it from infringement, declaring plaintiff's patent invalid and enjoining plaintiff from molesting Borden or Ready-To-Bake's other customers.

Borden had filed its answer to the original complaint denying infringement by directly or through the distribution and sale by it of Ready-To-Bake's products and it also attacked the validity of the plaintiff's patent and by counter-claim averred that in the near future it proposed to make for sale and distribution a ready-to-bake dough which would infringe the plaintiff's patent, if valid, and prayed that the Court declare plaintiff's patent invalid.

A pre-trial hearing was held on January 29, 1951, at which Ready-To-Bake and Borden claimed that Kraft Foods Company, as plaintiff's licensee, had manufactured, sold and distributed ready-to-bake products under the patent in suit and was therefore a necessary party for a full hearing and determination of rights.

Kraft Foods Company shortly thereafter filed its intervening petition adopting substantially the allegations of plaintiff Ballard's complaint, as amended, and seeking the same relief so far as applicable on account of the alleged infringement.

At the trial in June 1951, it was disclosed that plaintiff Ballard had sold all of its assets, incuding the patent and all rights in this action against the defendants arising out of the alleged infringement to Pillsbury Mills, Inc. Motion was made to substitute Pillsbury Mills, Inc., as plaintiff for Ballard & Ballard Company. By agreement of all parties to this motion, it was sustained and the substitution made.

Before concluding the introduction of the proof, in chief, plaintiffs moved to amend their complaints, as amended, by striking out, with prejudice, all claims for monetary recovery and damages. This left the declaration of rights and injunction the only relief sought by complainants. Their right to this relief depends upon the validity of the patent.

The parties in interest have, by qualified experts and many other witnesses, fully developed the case in evidence. Counsel have, by trial briefs, oral arguments and suggested findings of fact and conclusions of law, based upon cited authorities, been of inestimable assistance to the Court. Upon that record, the Court makes the following—

## Findings of Fact.

1. The original plaintiff, Ballard & Ballard Company, hereinafter referred to as "Ballard", is a Kentucky corporation, with its mills and principal place of business at Louisville, Kentucky.

2. Intervener plaintiff Kraft Foods Company, was originally organized as a corporation under the laws of Delaware, under the corporate name Kraft Cheese Company, the name subsequently changed to Kraft-Phenix Corporation and again changed to Kraft Foods Company. Its principal place of business is Chicago, Illinois. It will hereinafter be referred to as "Kraft".

3. Defendant, the Borden Company, is a corporation of New Jersey, with its principal place of business the City of New York. It will be referred to as "Borden".

4. Defendant, Intervener, Ready-To-Bake Foods, Inc. hereinafter referred to as "Ready-To-Bake" is a corporation of California.

5. All of the parties concede, and the Court finds, that it has jurisdiction of the parties and of the subject matter, both upon the claims for injunction on account of infringement under Title 28 U.S.C.A. §§ 1338(a, b) and 1332(a) and for a declaratory judgment (upon the counter-claims of Borden and Ready-To-Bake) under Title 28 U.S.C.A. §§ 2201 and 2202.

6. The patent in suit is owned by Pillsbury and was acquired as part of the assets purchased by it from Ballard, the written assignment being under date of July 2, 1951. The patent was issued to Ballard August 9, 1949, on assignment from the inventors Lowell Armstrong and Lively B. Willoughby.

7. The patent begins by stating that the invention relates to packaged dough for distribution "of the type having a preformed body or bodies of dough substantially filling the package" and "protected against excessive loss of water and of leavening gas by a substantially impervious wrapping contained within a pervious but mechanically strong container". For further information about this process, to which the patent in suit relates, it incorporates by reference the old Wil-

44

loughby patent, stating that "Packaged foods of the general type to which the present invention relates are described and claimed in the prior patent of Lively B. Willoughby No. 1,811,772 of June 23, 1931, reissued April 19, 1932, No. 18,426", and that "the present invention constitutes an improvement on the invention described and claimed in said prior patent and re-issue patent".

8. June 23, 1931, patent number 1,811,-772 issued to Lively B. Willoughby (Assignor to Ballard). This patent was reissued April 9, 1932, as number 18,426.

Under an agreement made January 21, 1931, Ballard acquired Willoughby's entire business, then being conducted by the latter on 34th Street in Louisville in a building built originally as a garage.

9. Willoughby had moved to Louisville in 1929 from Bowling Green, Kentucky. He was in business in Bowling Green as a wholesale baker, selling to grocers for re-sale, bread, rolls and cakes. While out West in 1920, he started experimenting with biscuit dough, and later continued these experiments in Bowling Green. He came to Louisville in 1929, and began making biscuit dough for sale in unbaked form in his neighborhood. The biscuits were packaged in a box containing twelve rings, each of which held one biscuit, wrapped with regular waxed paper and sealed with an iron. On this he got a patent February 13, 1930, claiming—

"An article of manufacture, a narrow ring formed of cardboard or the like and having its inner surface coated with paraffine, an uncooked biscuit, circular in shape, inserted in said ring with its sides in contact with the paraffine thereon, said biscuit and ring being closed in a waxed wrapper."

10. At the time of the sale of his business to Ballard, Willoughby, in January 1931, was operating in a concrete block building on 34th Street in Louisville, the building being approximately 30x35 to 40 feet. The principal room, called in the evidence the "work room", was approximately 20x25 feet in size, and heated by one stove.

There was a small room, in which there was no heat where the biscuits were stored, known as the "cold room".

The process followed was to mix relatively small amounts of dough in a bowl, roll the dough, cut the biscuits and stack 12 biscuits in a roll wrapped in metal foil and this package was placed in a spiral-bound fibre can, the tops of which were fastened on with glue. The tops had a small hole which served as an escape vent for air and also provided a means by which a straw was inserted into the can, by which operation it could be ascertained whether the dough had risen and the extent to which it had filled the fibre can. After the cans were capped, they were placed on racks in the work room and tested by the straw process and also by feeling the can to observe the extent of the expansion.

When the dough had expanded so that it was thought the can was sealed by the expansion of the impervious foil wrapper against the pervious fibre can, the cans were transferred to the cold room for the purpose of curtailing the action of the baking powder which had caused the expansion in the heated work room.

Willoughby could not recall at the time of the trial the exact formula used in the dough, but recalled he had recited it after his sale to Ballard to Lawrence Whiting, Chief Chemist of Ballard, who had written the formula out. The formula included flour, Fleischman's baking powder, salt, sugar, shortening and at times, buttermilk and soda. The Fleischman's baking powder was a commercial product then known to be in general use by bakers. Willoughby liked it, though he says it was not until sometime in 1944, that he knew that one of the ingredients in the baking powder was sodium acid pyrophosphate.

11. When the sale was consummated to Ballard, the operations continued at the 34th Street location until May 1931, when the operation was moved to a new building on Barrett Avenue in the vicinity of Ballard's mills.

In October of that year, the biscuit operation was moved into larger quarters adjoining one of the milling buildings.

Soon after moving from the 34th Street location, the fibre ends of the cans were abandoned and metal substituted. This substitution was largely because of the effects of moisture in refrigeration on the cardboard ends and also because the fastening of the cardboard ends on the carton with glue was sometimes a difficult operation and unsatisfactory, in that the cans frequently did not withstand the pressure of the expansion of the dough.

The new metal ends were mechanically crimped on to the cans and a conveyor belt was also provided to transfer the cartons, holding 48 cans, (in which cartons the cans were placed as soon as sealed and labeled) to the refrigerator room.

12. On December 19, 1931, Ballard entered into a written contract with the Kraft-Phenix Cheese Corporation, whereby Kraft purchased the packaged biscuits for resale through its distributors and it participated in Ballard's profits. The arrangement provided for the distribution of biscuits throughout an area from Colorado to the Atlantic Coast.

Operation under this contract were suspended in June 1932, because of spoilage and unsatisfactory operation. Ballard lost substantially $300,000 in 1932, because of spoilage and return of merchandise. The Ballard-Kraft contract was cancelled by mutual agreement August 8, 1933, but shortly thereafter another contract was executed under which Kraft resumed its distribution. Ballard had by this time reduced its force in its factory and removed two of three production lines and two conveyor belts.

When the operations were resumed with Kraft, the cartons were left in the mixing rooms until a sufficient number had accumulated to justify putting a man in the refrigerator room to receive them. The cartons were left in the mixing room for an average of one hour. It was during this operation that Ballard observed that sufficient pressure was developing in the cans to effect a seal of the wrapper. The pressure tests continued to be used—of the straw and thereafter feeling of the cans.

The operation, by this process, continued until sometime in the year of 1941 or 1942, when on account of the demands of the war, aluminum foil became unavailable.

Ballard continued with laminated glassine, bond and

| Year | Dozen |
|------|-------|
| 1933 | 17,092 |
| 1934 | 66,022 |
| 1935 | 137,040 |
| 1936 | 313,792 |
| 1937 | 609,156 |
| 1938 | 697,536 |
| 1939 | 744,228 |
| 1940 | 829,880 |
| 1941 | 963,698 |
| 1942 | 1,229,988 |
| 1943 | 1,817,108 |
| 1944 | 2,323,996 |
| 1945 | 2,498,048 |
| 1946 | 5,352,160 |
| 1947 | 5,124,080 |
| 1948 | 5,167,746 |
| 1949 | 4,958,538 |
| 1950 | 4,398,232 |

13. June 9, 1945, Willoughby and Lowell T. Armstrong filed application number 598,450 for patent on a process of packaging prepared dough along substantially the same lines used by Willoughby and described in the then existing patent. The additional step in the Willoughby and Armstrong application was known as "proofing". This, as described in the application, consisted of subjecting the package to "conditions adapted to produce relatively rapid evolution of gas within the dough, and substantially terminating such relatively rapid evolution of gas when the dough has expanded sufficiently to be restrained by the container and when a substantial unexhausted reserve of gas-releasing baking compound and of slow acting baking acid remains in the dough."

This application was abandoned August 4, 1948, and another application, number 42,486 filed, which latter application terminated on August 9, 1949, in the granting of the patent in suit—number 2,478,618, containing the above claim.

Claims 10 and 11 in the Willoughby Patent number 1,811,772 and in Reissue Patent number 18,426 state—

"10. The method of preservatively packaging uncooked leavened dough for commerical purposes, which consists in arranging a separable number of wrapped pieces of the dough in a closed container provided with an air-escape vent, subjecting the filled container to heat so as to expand the dough therewithin by action of the leavening and seal over said vent by pressing a part of the wrapping thereover after first expelling air therethrough and thereafter subjecting the container to a low temperature to arrest the leavening action with the dough in the expanded condition.

"11. The method of packaging uncooked dough preservatively for commercializing purposes, which consists in cutting the dough in pieces, arranging the pieces with separators between in a closed non-adhesively lined container having an opening in one of its ends, subjecting the filled container to heat to initiate leavening action and expansion of the dough so as to compress against the ends of the container and to seal the opening in said one thereof, and thereafter subjecting the container to refrigeration to cool the dough and arrest the leavening action thereof in the expanded condition."

Except for experimental purposes for short intervals, Ballard has used Willoughby's formula consistently since acquiring the business and patent in 1931.

In summarizing plaintiff's contention, in argument, Counsel for Ballard says—

" * * * 'for plaintiff says to the defendant, 'You are perfectly free to use the Willoughby patent. You are perfectly free to do what Willoughby did at 34th Street, so long as you do not infringe the patent in suit. You can allow those biscuits to sit out in room temperature until the dough fills or almost fills the container, then place the biscuits under refrigeration, and we will make no complaint whatsoever, even if you use sodium acid pyrophosphate in the amount claimed, so long as you don't do what we do now, and what our patent protects, the step of developing high pressure in the package. They can do everything but that' ".

14. Counsel's statement would indicate that the validity of the patent in suit is dependent for novelty and invention upon the process of developing high pressure in the package. Apparently, Counsel realized that the designation of the percentage of sodium acid pyrophosphate within the limits designated in the patent in suit had been practiced under the Willoughby Reissue patent 18,426 to the extent that it could not feasibly be claimed that Ballard did not use a formula containing substantially the amounts of sodium acid pyrophosphate referred to in the patent in suit from the inception of the manufacture of biscuits by Ballard in accordance with the Willoughby formula.

It will be observed that with respect to the "development of high pressure in the package" referred to by Counsel that the patent in suit nowhere designates the extent or degree or the means of ascertaining, other than by feeling of the package, the extent or degree of the pressure contained therein.

The Willoughby Reissue patent number 18,426, on page 2, column 2, lines 105 to end of paragraph, provides that "On expanding to the limit in full and tight occupancy of the tube, the air will have been expelled therefrom and a part of the wrapper over the aforesaid top-most (now bottom-most) roll will be pressed firmly against the vent in the cap so as to close it. When the sealing is effected, the closure caps may be bulged out somewhat by the pressure as exemplified in Fig. 7 showing the finished product."

It can be argued, with reason, that when the dough in the package expands *"to the limit* in full and tight occupancy of the tube" and so as to bulge the ends of the package, that high pressure has been developed.

An examination of Claims 20 and 23 of the Reissue patent number 18,426 would in-

dicate high pressure within the package from the leavening action of the dough.

The patent in suit is obscure as to what constitutes "high pressure". Certainly it is no more instructive on this feature of the process than is the Reissue patent number 18,426 under which Ballard operated throughout the seventeen years provided by the law for enjoyment of a monopoly under a patent.

15. Sometime in the fall of 1933, Kraft renewed its contract with Ballard and again began to distribute the biscuits as a licensee of Ballard. In 1938, as the result of a suit by Ballard against Mary Allan Foods, Inc., a California corporation, for infringement of the Reissue patent 18,426, the Mary Allan went out of business and in 1940, a group of Kraft's executives bought the assets of the Mary Allan Foods corporation and manufactured and distributed the biscuits from the plant on the Pacific Coast. The venture by Kraft's executives was not successful and they requested Ballard to take over that Company, which it did in 1941. That plant was located in San Francisco.

In March 1942, Kraft established a plant at Los Angeles and began the manufacture, sale and distribution of biscuits under the Willoughby Reissue patent number 18,426. This operation continued until October 1947, when it closed the plant at Los Angeles and established a new one at Oakland, California.

16. In the early part of 1947, Morris Fortney, a grocery clerk and Stewart Kennard, a cheese salesman, and former truck driver for Kraft, formed a partnership and manufactured and sold Ready-To-Bake biscuits under the name of K & F Foods. By November 1947, they organized a corporation known as the Mary Ann Foods and operated under that name up to September 1949.

It is reasonably certain that Steward Kennard obtained the formula for the biscuits prepared by this company while driving the truck for Kraft and by reason of that employment gained access to the mixing room.

From October 1949 until April 1950, the biscuits manufactured by Mary Ann Foods were distributed by Borden under the latter's name. By October 1950, Borden ceased to distribute the Mary Ann biscuits and the Ready-To-Bake Company then began to, and up to the time of the trial of this action, was distributing its biscuits under the name "Puffin". (The Mary Ann Company became the intervening defendant, Ready-To-Bake).

17. Ready-To-Bake biscuits were produced substantially under the same process outlined by the patent in suit and by the the Willoughby patent number 18,426. Borden began the sale of Ready-To-Bake biscuits in January 1948 and continued to buy and sell them until about October 1950. Until October 1949, the Ready-To-Bake biscuits were manufactured at Los Angeles, but about October 1949, Ready-To-Bake, with Borden's assistance, established an additional plant at Plymouth, Wisconsin, the output from which plant was sold to Borden for re-sale until about January 1951.

About November 1950, Ready-To-Bake began operation of a plant in Charlotte, North Carolina, and about October 1950, Borden established and began operation of a plant in Los Angeles, California and Atlanta, Georgia, at which plants it has manufactured and now sells biscuits under the brand name "Borden".

18. If the patent in suit is valid, both Borden and Ready-To-Bake are guilty of infringement and should be enjoined.

19. With respect to the plaintiff's charge of unfair competition on the part of the defendants—that is, that the defendants Borden and Ready-To-Bake have unfairly simulated the appearance, size and form of plaintiff's labels and packages for the purpose of deceiving purchasers to the extent that they would buy the Borden or Ready-To-Bake biscuits when seeking Ballard's biscuits, it may be said that there is no proof that any purchaser at any time was so deceived or confused by the appearance, size, or similarity of the label or package as to purchase Borden or Ready-To-Bake biscuit instead of Ballard's.

Ballard's labels were predominantly blue and white, with some red lettering from 1931 to 1948, except the label identified in the record as plaintiff's exhibit 31, which was dark brown and yellow, used on whole wheat "Oven Ready" biscuits.

Sometime in 1946, Ballard began to use labels predominantly red and white, on all Ballard labels, there was a reference to the patents. Prior to the granting of the Reissue patent in 1932, the reference was to patents number 1,811,772 and 1,760,732 and after the Reissue patent issued in 1932, the labels contained a reference to patents numbers 1,811,772 and 18,426.

Ballard's labels up to about 1946 had a circular vignette, in which there was a Chef holding a plate of biscuits. This Chef wore a white cap and a red coat. About 1946, or shortly afterwards, this was changed to a Chef with a large white cap and a white coat. On all Ballard's labels, there were advertising for pecan quickies, strawberry shortcake, peach shortcake, dumplings or doughnuts, all of which, the label advised could be made with the "Oven Ready" biscuit dough.

Borden's labels were predominantly blue and white and a close comparison of Borden's labels with those of Ballard does not indicate that there could have been any confusion, caused by the labels. Borden's labels contained no reference to a patent number and contained a vignette of its trademark "Elsie' The Cow".

20. The Puffin label, adopted and used by Ready-To-Bake since April 1950, and which label was used by Borden in 1950, is not similar in coloring, appearance, arrangement or otherwise to any of Ballard's labels. The Puffin label contained the name "Puffin" on the front and back of the label and so far as the exhibits in this case indicate, this was the first label with the name "Puffin" on the back called a lay-down label—that is, the name could be read when the product was standing on end or laid on its side.

Ballard began to use this lay-down feature on its label sometime after the Puffin label appeared on the Ready-To-Bake products.

The Mary Ann label, used on the packages of biscuit dough sold by Borden during 1948 up to September 1949 and on Ready-To-Bake biscuits from November 1947 to September 1949, was entirely different from the label used by Ballard and that used by Borden.

21. Ballard's labels underwent numerous changes, not only in color and advertisements of dumplings, shortcake and doughnuts, capable of being made from the biscuit dough, but also with respect to directions for opening the package, and sale promotional schemes, featuring flower bulbs, etc., as premiums.

Neither Borden nor Ready-To-Bake used any promotional schemes on its label, nor did either advertise its product other than for biscuit dough.

### Conclusions of Law

1. Section 40, Title 35 U.S.C.A. gives the patentee a monopoly in the use of his invention for a period of seventeen years. The extent of that right is limited by the definition of his invention as defined in the specifications and claims of his patent. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed. 852.

The claims measure the invention and may be explained and illustrated by the description. They cannot be enlarged by it. The claims of a patent are to be construed liberally so as to uphold and not to destroy the right of the inventor. Temco Electric Motor Company v. Apco Manufacturing Company, 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298.

Ballard, as the holder of the Reissue patent number 18,426 and the preceding patent number 1,811,772 enjoyed such monopoly from June 23, 1931 to June 23, 1948. The original patent is surrendered when a reissue is obtained, but the patent on the Reissue expires seventeen years from the date of the original patent. Scott Paper Company v. Marcalus Company, 326 U. S. 249, 66 S.Ct. 101, 90 L.Ed. 47.

The application for the patent in suit, number 2,478,618, was filed August 4, 1948. The latter is, by its terms, an im-

provement upon the prior patents numbers 1,811,772 and 18,426. As our Court of Appeals said in Ternstedt Manufacturing Company v. Motor Products Corporation, 6 Cir., 119 F.2d 834, 838—

"It is often difficult to draw the line between patentability and improvements or adaptations. Each case must be decided on its peculiar facts. Roemer v. Simon, 95 U.S. 214, 218, 24 L. Ed. 384."

■ Borden and Ready-To-Bake have insisted that the process employed by Willoughby and Ballard from 1931 up to the time of the trial is substantially the same process as that employed by defendants Borden and Ready-To-Bake. Therefore, if their use of the process constitutes infringement of the patent in suit, number 2,478,618, the latter is invalid because anticipated by the prior use under the previous patents. In other words that which, if later, infringes a patent, anticipates it, if earlier. Perfect Circle Company v. Hastings Manufacturing Company, 6 Cir., 88 F.2d 813, 816, Miller v. Eagle Manufacturing Company, 151 U.S. 186, 14 S.Ct. 310, 316, 38 L.Ed. 121.

There is ample proof of improvement by Ballard in the manufacture of the biscuits, at least from the Fall of 1933 up to the present time—improvement in the technique and improvement in the facilities employed in its manufacturing. However, it is equally true, that throughout the period except for short periods of experimentation, plaintiff used the same formula which contained the amount of sodium acid pyrophosphate which it now says is necessary for success in the operation and subjected the packaged biscuit discs to heat until the dough had expanded to fill the container and then placed the package in refrigeration to arrest the evolution of gas. The amount of gas that the package should contain at the time it is placed in refrigeration, at all times was, and is now, ascertained by feeling of the can. If in the judgment of the person feeling the can, the package was sufficiently strutted with the expanding gas, the package should be placed in refrigeration. Thus plaintiff's case narrows down to a contention that the judgment of the per-

son feeling of the can constituted the patentability of the patent in suit.

■ Even if this intangible were patentable, Ballard's use of this same process for more than a year prior to 1948—certainly from 1938—down to the date of the application of the patent in suit, would nullify the latter.

If the dough expended "to the limit in full and tight occupancy of the tube" and the air had been expelled from the package and part of the wrapper of the dough had been firmly pressed against the cap in the vent, so as to close it and to bulge somewhat the closure caps, as provided for in Reissue patent 18,426, and otherwise expressed in claim No. 22 "permitting the dough to rise while in the container *to a degree of pressure against its walls* excluding air from the container", the process would be as provided for in the Reissue patent 18,426. Under the patent in suit, if the expansion of the dough caused by the application of heat was substantially terminated when the dough had expanded sufficiently to be restrained by the container and "when a substantial unexhausted reserve of gas-releasing baking compound and of slow-acting baking acid remains in the dough", the process would be under the patent in suit.

The patent in suit provides no means of determining the extent of pressure in the can, except by feeling of the can and observing the bulge, if any, in the closure caps.

This Court is unable to conclude that there is a patentable invention in the patent in suit over the Reissue patent.

■ 11. It is true that a patent carries with it a presumption of validity. However, in this case, that presumption is less important, because of the policy and purpose of the patent laws to prevent a reservation or continuation of the monopoly by the patentee (or others claiming under him) after the expiration of the first patent. This is in the interest of the general public. In Scott Paper Company v. Marcalus Company, supra [326 U.S. 249, 66 S.Ct. 105], the Court said—

"It is thus apparent that the patent laws preclude the patentee of an expired patent and all others including petitioner from recapturing any part of the former patent monopoly * * *."

The law having given the inventor seventeen years within which to enjoy the monopoly, exacts of him in return, a full disclosure of the manner of making and using the invention, and upon the expiration of the period of monopoly, the public is free to use the invention and the policy of the law is to encourage the use thereof so as to provide the competition which will result in benefit to the general public.

A change in an existing device, which involved only a difference in form, proportions or degree and results in doing substantially the same thing in the same way by substantially the same means, even if with better results, is not invention. Midland Flour Milling Company v. Bobbitt, 8 Cir., 70 F.2d 416.

It is therefore concluded that the patent in suit is void.

111. Plaintiff's case against defendants for unfair competition is to be determined by the law of Kentucky and by the law as construed by our Court of Appeals for the Sixth Circuit.

There is no dispute between Counsel that under the applicable law, Borden and Ready-To-Bake were free to copy the size, shape and general appearance of Ballard's package provided there was no attempt to palm off on the buying public the products of Borden or Ready-To-Bake as the products of Ballard.

The Court of Appeals of Kentucky, in Acy v. Whaley, 281 Ky. 400, 136 S.W. 2d 575, 578, has thus stated the rule—

"Without regard to patents, every one is at liberty to make a replica of any article and no one can obtain a monopoly on it by being the first to manufacture or put it upon the market. It is not unfair trade or competition with the originator of such article that others should manufacture and sell the same thing."

The distinction in the law is that there should be no effort to deceive the public by directly or indirectly representing the product to be that of another. "The fundamental element in unfair competition", said the Kentucky Court of Appeals in Mayfield Milling Company v. Covington Bros. & Company, 212 Ky. 262, 278 S.W. 562, 564,

"is the element of deception; either one must directly represent his goods as that of another, or he must deceive the purchasing public of that article by placing it upon the market in such form and dressed with such symbols or insignia as to deceive them into believing it is the product of another. Without either direct deception or indirect deception practiced through trade methods, there can be no unfair competition."

In Socony-Vacuum Oil Company v. Rosen, 6 Cir., 108 F.2d 632, 635, the Court said—

"The rule is well-settled that nothing less than conduct tending to pass off one man's merchandise or business as that of another will constitute unfair competition. Goodyear's India Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U.S. 598, 604, 9 S.Ct. 166, 32 L.Ed. 535. Relief in such cases is granted where the defendant, by his marks, signs, labels or in other ways, represents to the public that the goods sold by him are those manufactured or produced by plaintiff, thus palming off his goods for those of a different manufacturer to the injury of plaintiff. * * * Since the essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as those of another, the question of intent to deceive is involved though it is not necessary to prove it by direct evidence. It may be inferred from circumstances and will be presumed where the resemblance is patent and the probability of confusion obvious."

The claimed simulation will best be determined by an examination of the labels.

"The judgment of the eye upon the two is more satisfactory than evidence

from any other source as to the possibility of parties being misled, * * *."
Liggett Tobacco Company v. Finzer, 128 U.S. 182, 9 S.Ct. 60, 32 L.Ed. 395, quoted in M. C. Peters Milling Company v. International Sugar Feed Company, 6 Cir., 262 F. 336.

Evidence of actual confusion is not necessary, but confusion or deception must be the natural and probable result of the resemblance.

"When it does not appear that the public has been moved in any degree to buy an article because of its source, an action for unfair competition does not lie."

American Fork & Hoe Company v. Stampit Corporation, 6 Cir., 125 F.2d 472, 476.

It has been found as a fact that there is no such simulation in the labels as would cause confusion or enable either of the defendants to palm off on the public its product as that of Ballard.

It is therefore the conclusion of the Court that neither Borden nor Ready-To-Bake has been guilty of such unfair competitive practices as would entitle the plaintiff to an injunction. It follows that the complaint of the plaintiff Ballard (now Pillsbury Mills, Inc.) should be dismissed and that defendants should recover their costs.

Judgment in accordance with this memorandum will be presented by Counsel for defendants on notice to plaintiffs.